UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARVEL WHITE,

     Plaintiff,

v.

FCA US LLC,

     Defendant.

Case No. 24-10160
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [23]

---

For a period of time, Carvel White worked with his wife at an FCA automotive plant in Detroit, Michigan. She was his team leader. Unsurprisingly, as their personal relationship deteriorated, so too did their employment environment. When White failed to return to work after taking leave for depression, he was terminated. He brought this lawsuit alleging various claims of race discrimination, unlawful retaliation, and disability discrimination in violation of federal and state laws. He also alleges wrongful discharge in violation of Michigan public policy. FCA says it was interpersonal conflict with his ex-wife that caused White's employment issues, not unlawful discrimination or retaliation. So it filed a motion for summary judgment as to all claims.

As White's claims fail as a matter of law, FCA's motion for summary judgment is GRANTED.

## I.

Carvel White began his employment with FCA in 2012, working at the Belvidere Assembly Plant in Belvidere, Illinois before transferring to the Jefferson North Assembly Plant in Detroit, Michigan. (ECF No. 23-2, PageID.188.) He worked in various departments before moving to a team led by Yolanda Massey (*Id.* at PageID.222.) In late 2016, he and Massey began dating and the two married in March 2019. (*Id.* at PageID.182.) But the relationship quickly soured, and White filed for divorce within the first year of marriage. (*Id.* at PageID.183.) He says after he filed for divorce, Massey started treating him badly at work, including frequent threats to take him off the job. (*Id.* at PageID.184–185, 221.) With the Covid-19 pandemic and the abuse he says he faced at work, he decided not to pursue the divorce at that time. (*Id.*) But soon enough, in 2021, both sides filed for divorce, and it was finalized in 2022. (*Id.* at PageID.185.) Around that same time, Kawana Nelson, a personal friend of Massey, became White's supervisor on the team led by Massey. (*Id.* at PageID.220.) White says Nelson started targeting him too.

## A.

Central to this litigation, in February 2022 White filed a human resources complaint alleging mistreatment from Massey and Nelson. (*Id.* at PageID.245.) Despite a positive employment history at FCA, White reported persistent verbal threats about his job performance from Massey and Nelson. (*Id.* at PageID.245–246.) And he says these threats started only after he had filed and refiled for divorce from Massey. *Id.*

White also claimed that Massey and Nelson failed to notify him about early shift dismissals as a way to harass him. (*Id.* at PageID.224–225 ("[T]here were times when I was left in my area after ending time . . . I was supposed to have been told that it was quitting time.").) He said this happened between 20 and 30 times and resulted in him working six to ten extra minutes, or sometimes even 30, without pay. (*Id.* at PageID.246; ECF No. 25, PageID.468.)

Human Resources conducted an investigation into White's complaints, but its findings were inconclusive. (ECF No. 23-5, PageID.372.) White followed up with HR a few months later to provide text messages to substantiate the claim about the late shifts. (ECF No. 23-2, PageID.247.) But HR had already investigated the alleged conduct and determined that the investigation should not be reopened. (*Id.* at PageID.255–256.)

**B.**

White decided not to file additional HR complaints (ECF No. 23-2, PageID.255) but says he continued to face retaliation and harassment (*id.* at PageID.291).

The verbal threats from Massey went beyond his employment and included threats of what he calls "personal harm." (*Id.* at PageID.258.) And Nelson made similar comments too. She told White that a former employee set her car on fire, and that she would "get to [White] before [he] can get [to her]." (*Id.* at PageID.228.)

Others made comments as well. Massey hosted a "divorce party" to celebrate her separation from White and invited other employees at the plant. (*Id.* at PageID.260.) Soon after, male employees began making comments at work, telling

White, "[If] [y]ou don't know how to take care of your wife, I will" and "there's more of us in here than you." (*Id.* at PageID.227, 263.) White says he felt he was in danger while at the plant though he was never physically harmed. (*Id.* at PageID.263.) He reported these threats to HR. (*Id.* at PageID.227.)

A few days after he filed for divorce, in late 2019 (*id.* at PageID.183), White claims Massey assigned him to a role as a floater,[1] a position that he had not previously held. (*Id.* at PageID.237–239). While the job paid the same (*id.* at PageID.244), he preferred his usual job in powder observation and believed Massey reassigned him out of spite. (*Id.* at PageID.237–239). This floater position lasted for a week and a half before he was returned to his usual role. (*Id.* at PageID.240.) A few years later, in March 2023, White was told his role in powder observation was eliminated. (*Id.* at PageID.230.) White did not agree and believed he was being replaced. (*Id.* at PageID.232.)

For all of these reasons, White submitted multiple transfer requests to move to a different plant, but none were granted. (*Id.* at PageID.205–206.) He acknowledges that transfers are granted based on seniority and availability. (*Id.* at PageID.206.) But he says other non-Black employees were transferred without any issues. (*Id.* at PageID.286–287, 306–307.) For instance, he said a white employee named Ben experienced harassment from a supervisor and was "immediately transferred to a different department." (*Id.*)

---

[1] A floater, as the name suggests, fills in for different jobs around the plant when there is a need. (*Id.*)

## C.

White went on medical leave on May 18, 2023, due to depression. (*Id.* at PageID.265.) Since his role in powder observation had just been eliminated, he was training for a new role with Massey, which he says contributed to his emotional state at the time. (*Id.* at PageID.266–267.) He experienced anger, confusion, and social isolation. (*Id.* at PageID.266.) He recalls not leaving his bedroom or doing anything but "get up, shower, and go back to bed." *(Id.* at PageID.194, 268.) He saw a therapist and started medication. (*Id.* at PageID.268–269.) His leave was initially granted for a month and a half (through June 30, 2023), but he requested and received a one-month extension due to his ongoing symptoms. (*Id.* at PageID.270.) At the end of July, he requested another one-month extension because his symptoms were not improving. (*Id.* at PageID.271.)

In August 2023, FCA, through its third-party claims manager Segwick, required White to undergo an independent medical evaluation. (*Id.* at PageID.272.) The results indicated that White was "able to work without restrictions."[2] (ECF No. 23-9, PageID.407.) White requested a review of this decision.

White's own doctor, Dr. Park, sent a letter stating that White needed more time on leave and that he should be transferred to a different plant. (ECF No. 23-11.) Dr. Park concluded, "It is my professional opinion that Mr. White cannot return to working at his former factory plant. Because working there aggravates and

---

[2] Failing to return to work would result in his healthcare eligibility terminating. (*Id.*)

exacerbates his symptoms to the point that Mr. White is and will continue to be completely and totally disabled." (*Id.* at PageID.438.) Dr. Park expressed his concern that if White returned to the same plant, he would resort to violence against himself and others. (*Id.* at PageID.438–439.)

Segwick denied the review of White's claim, explaining that the additional medical information provided by White's doctor did not substantiate total disability that would warrant additional leave time. (ECF No. 23-2, PageID.282–283.) The HR department sent White a letter instructing him to return to work within five days or be terminated. (ECF No. 23-13.) White did not return to work in that time, so he was terminated effective August 23, 2023. (ECF No. 23-10, PageID.420.)

**D.**

On January 19, 2024, White filed this lawsuit against FCA. (ECF No. 1.) He alleges racial discrimination under 42 U.S.C. § 1981 (Count II), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count V), and the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* (Count VI). He also claims retaliation in violation of 42 U.S.C. § 1981 (Count I), Title VII (Count III), ELCRA (Count IV), and the Persons with Disabilities Civil Rights Act (PWDCRA) (Count VII). Next, he brings failure to accommodate (Count IX) and hostile work environment (Count VIII) claims under the PWDCRA. Finally, he alleges he was wrongfully discharged in violation of Michigan public policy (Count X).

In March 2024, White filed a separate charge against his union claiming that it did not protect him from harassment. (ECF No. 23-2, PageID.298.) Sometime after,

6

the Union told White that he could return to his job in exchange for dropping the lawsuit against FCA. (*Id.* at PageID.299–300.) But the offer did not include transfer to a different plant, so White declined. (*Id.*) This lawsuit moved forward with discovery and now, FCA's motion for summary judgment. The motion is fully briefed and does not require further argument. *See* E.D. Mich. LR 7.1(f).

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added). A dispute is "genuine" if the evidence permits a reasonable fact-finder to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quoting Fed. R. Civ. P. 56(e)). So "[t]o survive summary judgment, the nonmoving party must present significant probative evidence putting the material facts in doubt." *Walden v. Gen.*

*Elec. Int'l, Inc.*, 119 F.4th 1049, 1057 (6th Cir. 2024) (internal quotation marks omitted).

## A. Exhaustion

Right out of the gate FCA questions whether White's Title VII claims (Counts III and V) are properly exhausted.

Title VII requires (1) the timely filing of a charge of discrimination with the Equal Employment Opportunity Commission, (2) the receipt of a right-to-sue notice, and (3) the timely filing of a lawsuit (4) that raises claims that are reasonably related to the claims raised in the administrative charge. *Bell v. Dollar Tree, Inc.*, No. 24-13259, 2025 WL 3252656, at \*5 (E.D. Mich. Nov. 21, 2025). "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). This is because the charged party would not have notice and the EEOC could not fulfill its "investigatory and conciliatory role." *Id.* But "[w]hen the EEOC investigation of one charge in fact reveals evidence of a different type of discrimination against the plaintiff," or "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim," the lawsuit with the new claim may proceed. *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998). In other words, a plaintiff's Title VII claims are "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Szeinbach v. Ohio State Univ.*, 987 F. Supp. 2d 732, 747 (S.D. Ohio 2013) (citing *EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1235 (6th Cir.1980)); *see also*

*Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (explaining that the exhaustion requirement "is not meant to be overly rigid" such that "the EEOC complaint should be liberally construed to encompass all claims 'reasonably expected to grow out of the charge of discrimination'") (citation omitted).

FCA points out that while White's EEOC charge lists May 16, 2023, as the date of the most recent discriminatory action, the details within the charge are all from before April 5, 2022. (ECF No. 23, PageID.147.) That may be true. But the charge offered enough facts about Massey's alleged behavior toward White, including the job rotation and late notice of early dismissals, to prompt a full EEOC investigation of both discrimination and retaliation. (ECF No. 23-14, PageID.446.) So both claims are within the scope of the EEOC charge. *See, e.g.*, *Dixon v. Ashcroft*, 392 F.3d 212, 218 (6th Cir. 2004) ("Applying the expected scope of investigation test to this case, we find that the factual allegations were sufficient to put the EEOC on notice that Dixon perceived himself to be a victim of retaliation, in addition to race discrimination"); *Poweleit v. DeJoy*, 667 F. Supp. 3d 674, 678 (S.D. Ohio 2023) (finding employee's claim that she was terminated for escalating complaints was reasonably expected to grow out of her EEOC charge of discrimination); *Szeinbach*, 987 F. Supp. 2d at 749 (concluding that employee's lesser pay raise retaliation claim was within the scope of her charged research misconduct retaliation claim).

White's Title VII claims (Counts III and V) were properly exhausted.

### B.  Discrimination

Turning to the merits, the Court will start with FCA's contention that it is entitled to summary judgment on White's race discrimination claims.

Courts analyze discrimination claims under § 1981, Title VII, and ELCRA using the same framework, and neither party has indicated material differences in the legal analysis pertaining to these claims. So the Court will consider case law on each statute interchangeably. *See, e.g.*, *Smith v. City of Toledo, Ohio*, 13 F.4th 508, 514 (6th Cir. 2021); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001).

Since White relies on indirect evidence of discrimination, the *McDonnell-Douglas* burden shifting framework applies. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). White has the initial burden of establishing a prima facie case. *Id.* If White does so, the burden shifts to FCA to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id.* (citing *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If FCA satisfies its burden, White must "prove by a preponderance of the evidence that the legitimate reasons offered by [FCA] were not its true reasons, but were a pretext for discrimination." *Id.*

To establish a prima facie claim of race discrimination, White must show:

1) he is a member of a protected class;

2) he was qualified for the job and performed it satisfactorily;

3) despite his qualifications and performance, he suffered an adverse employment action; and

4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).

### 1. Prima facie case

The parties do not dispute that White is a member of a protected class and that he was qualified for his job and performed it satisfactorily. (*See* ECF No. 23, PageID.155; ECF No. 25, PageID.474–476.) Nor do they dispute that White suffered an adverse employment action. They disagree, however, on the nature of that action. FCA says only White's firing counts as an adverse employment action, while White also includes his lack of transfer to another plant. (ECF No. 23, PageID.15.)

FCA has the better argument. An adverse employment action for a discrimination claim "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). Only White's termination fits that description, not his transfer request. It lasted only a week and a half, did not affect his compensation, and did not impose any identified unpleasantries. *See, e.g., Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007) ("a purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes."); *Blackburn v. Shelby County*, 770 F. Supp. 2d 896, 925 (W.D. Tenn. 2011) (finding challenge to transfer placement was not an adverse employment action because there was no

11

change in the material aspects of the job such as "pay, benefits, seniority, rank, or job status").

As to the final element of the prima facie case, White focuses almost exclusively on his failed transfer request. He identifies only one comparator outside his class—white coworker Ben who White says was harassed by a supervisor yet quickly transferred. (ECF No. 25, PageID.474.) But White's denial of a transfer was not an adverse action that can support his discrimination claims. So Ben is not a useful comparator for White's only viable adverse action—termination.[3]

And White otherwise fails to identify *any* "similarly situated" non-Black employee who failed to return to work within the requisite time frame after being cleared by Sedgwick and yet was not fired. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (concluding plaintiff failed to show other employee's actions were of "'comparable seriousness' to the conduct for which Plaintiff was discharged")

In his deposition, White made a vague assertion that "FCA has [a] pattern/practice of terminating and not accommodating [sic] African-American males at disproportionate rate than others." (ECF No. 23-2, PageID.304.) But he bases this on "[j]ust conversation. People that I've seen terminated versus the people that wasn't black." (*Id.*). He did not know why these employees were terminated. (*Id.*) Such speculative and conclusory allegations do not create a material fact issue on this

---

[3] Even if the transfer was an adverse employment action, there are no facts establishing Ben and White are similarly situated. FCA bases transfers on seniority and availability (ECF No. 23-2, PageID.206), but White does not provide information about Ben's seniority level or whether positions were available. (ECF No. 23-2, PageID.287.)

point. *See, e.g., Reedy v. West*, 988 F.3d 907, 914 (6th Cir. 2021) ("The purpose of summary judgment is to determine whether a material fact dispute exists for the jury to resolve, 'not to replace conclusory allegations of the complaint or answer with conclusory allegations [in] an affidavit,' verified complaint, or deposition.") (citation omitted); *Hedberg v. Ind. Bell Tel. Co.*, 47 F. 3d 928, 932 (7th Cir. 1995) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."). Indeed, in no way does this testimony establish that these other employees were similarly situated.

In sum, White does not make out a prima facie case on his race discrimination claims.

### 2. Legitimate Non-Discriminatory Reason

Even assuming White made out a prima facie case of race discrimination, FCA provided a legitimate, non-discriminatory reason for his termination. White, says FCA, "failed to return to work or provide adequate substantiation for his continued absence after an independent medical examiner found him able to return to work without restriction." (ECF No. 23, PageID.137, 153; *see also* ECF No. 23-10, pageID.414 (FCA human resource generalist testified that White "was terminated for not substantiating his absence").) As to the transfer issue, assuming White did submit requests through the portal, transfers were based on seniority and availability, not race. (ECF No. 23, PageID.142.)

13

### 3. Pretext

The burden then shifts back to White to show that FCA's reason for denying his transfer requests and for his firing was a pretextual cover for unlawful discrimination. Pretext is established by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [FCA's] action, or (3) that they were insufficient to motivate [FCA's] action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* at 400 n.4. "[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.*

Here, White calls FCA's enforcement of the independent medical examination "convenient" and says it was used to "force [him] back into a hostile work environment" that it knew he would not endure. (ECF No. 25, PageID.476.) But there is no evidence that FCA selectively enforced its IME process. Instead, the record shows that FCA and the union agreed to follow and be bound by this process. (ECF No. 23-6, PageID.381.) With nothing to counter, White has not shown FCA's proffered reason for terminating him was pretextual. *See Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) ("The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence.").

White also fails to show that FCA's reason for not granting him a transfer was pretextual. Again, he acknowledges that transfers are based on seniority and

14

availability. (ECF No. 23-2, PageID.206.) And he has nothing to support his supposition that his transfer requests were blocked because of his race. (ECF No. 23-2, PageID.235 ("Q: Do you have any evidence that your transfer request was blocked? A: No.").) He even acknowledged that his union confirmed no transfers were blocked. (*Id.* at PageID.236.)

Thus, no reasonable jury could find in favor of White on his racial discrimination claims.

## C. Retaliation

White also contends that he was retaliated against after complaining about employment discrimination in violation of 42 U.S.C. § 1981 (Count I), Title VII (Count III), ELCRA (Count IV), and PWDCRA (Count VII). (ECF No. 1, PageID.8, 12, 14, 19.)

Since White has no direct evidence of retaliation, the Court once again employs the *McDonnell-Douglas* burden shifting framework in analyzing FCA's summary judgment motion. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021); *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)).

To make out a prima facie case of retaliation, White must establish:

(1) he was engaged in protected activity,

(2) the employer knew of the exercise of the protected activity,

(3) he was subjected to adverse employment action, and

(4) there is a causal link between the protected activity and the adverse employment action.

*Jackson*, 999 F.3d at 344 (reciting elements of the prima face case for retaliation under Title VII and ELCRA); *Bloomer v. Word Network Operating Co., Inc.*, 785 F. Supp. 3d 251, 271 (E.D. Mich. 2025) ("The elements of a retaliation claim under § 1981 are the same as under Title VII."); *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015) (listing elements of the prima facie case for retaliation under PWDCRA).[4] As above, the analysis of retaliation under each statute mirrors the other, so the Court will address these claims together and cite the case law interchangeably. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018) (analyzing § 1981, Title VII, and ELCRA retaliation claim as one); *Reeder v. County of Wayne*, 177 F. Supp. 3d 1059, 1081 (E.D. Mich. 2016) (considering Title VII, ELCRA, and PWDCRA retaliation claims together).

### 1. Prima facie case

The first element, protected activity, is when an employee has "'opposed any practice' made unlawful under Title VII." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 373 (6th Cir. 2013); *see also Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 532 (6th Cir. 2021) ("Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination.") (citation omitted). White

---

[4] For a retaliation claim under the PWDCRA, White would also have to establish he has a qualifying disability. For now, the Court will assume that White makes this showing. But the Court discusses this question further when addressing the failure to accommodate and hostile work environment claims.

claims multiple protected activities, so the Court will evaluate whether he makes out a prima facie case under each.

### a. Human Resources Complaints

The parties disagree on whether White's complaints to FCA's Human Resources department in February and April 2022 constitute protected activity. (ECF No. 23, PageID.148; ECF No. 25, PageID.466.)

The Sixth Circuit "has interpreted 'protected activity' broadly to include 'complain[ts] to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009). A plaintiff need not make such a complaint "with absolute formality, clarity, or precision," but the plaintiff must allege more than a "vague charge of discrimination." *Jackson*, 999 F.3d at 345 (citing *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015)). So "complaining about discriminatory treatment" in sufficient detail is a protected activity. *Young v. Bernhard MCC, LLC*, 602 F. Supp. 3d 1065, 1069 (M.D. Tenn. 2022). However, complaining that a termination "wasn't fair" without "expressly discuss[ing] the issue of race discrimination" is not. *Arredondo v. Beer Barrel Inc.*, 645 F. Supp. 3d 739, 754 (N.D. Ohio 2022).

In his February 2022 HR complaint, White raised that his supervisor (Nelson) and team leader (Massey) were targeting him after his divorce. (ECF No. 23-2, PageID.245.) He says they threatened him about his job performance, despite his consistently positive reviews in the past. (*Id.* at PageID.246.) And he reported that

17

other men at the plant made threatening comments to him "around the end of the marriage." (*Id.* at PageID.227.) He was also concerned that Massey and Nelson were not telling him when the shift ended early, resulting in him working extra time than his coworkers. (*Id.* at PageID.247.) Finally, he reported being temporarily reassigned to a floater position. (*Id.* at PageID.258.)

HR investigated White's claims, but its findings were inconclusive. (ECF No. 23-5, PageID.372.) In April 2022, White provided HR with text messages to further demonstrate that Nelson and Massey did not tell him when his shift was over. (ECF No. 23-4.) But because it concerned already-investigated conduct, HR decided to not reopen the investigation. (ECF No. 23-2, PageID.255.)

What the HR complaints reveal, however, is that White did not complain about race or disability[5] discrimination. When asked at his deposition whether Massey and Nelson were targeting him because of his race, White responded, "I can't say they were targeting me because of my race but I can say that race came up." (ECF No. 23-2, PageID.290.) And he noted that Nelson often used the N-word. (*Id.* at PageID.288 ("Kawana [Nelson] was big for the N-word, even though she was black.").) But again, this is not what he was complaining about.

---

[5] In his briefing White does not mention, much less substantiate, his allegation that he faced retaliation for reporting disability discrimination (ECF No. 1, PageID.19.) So the Court finds he did not support his PWDCRA retaliation claim. A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quoting Fed. R. Civ. P. 56(e)).

18

Instead, White was reporting disparaging treatment due to his divorce from Massey. (*See, e.g.*, ECF No. 23-2, PageID.246–247 ("I told [HR] that I was being targeted by Yolanda and Kawana; . . . immediately after our divorce situation came up, every day I come into a threat of job performance; and by that time, they were forgetting to tell me that the job ended for the night."); *id.* at PageID.227 ("There were just men coming up to me . . . around the end of the marriage, [saying] 'You don't know how to take care of your wife, I will . . . .'").) Even though, as he says, "race came up," White needed to bring more than a "vague charge of discrimination" to "constitute opposition to an unlawful employment practice." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989).

Moving on, though, and assuming the HR complaints were protected activity, there is no dispute that people in HR were aware of them. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 414 (6th Cir. 2021) ("[a]n employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized . . . to receive and respond to or forward such complaints to management.")). But White has made no showing that the individuals who terminated or declined to transfer him knew about these complaints.

Looking past this deficiency as well, White next needs to show that FCA took an adverse employment action against him after he filed his HR complaints.

FCA again contends that White's firing in August 2023 was the only adverse employment action against White. (ECF No. 23, PageID.150–151.) White disagrees. He also includes "being told late about early dismissal on multiple occasions," (ECF

19

No. 25, PageID.468), being temporarily assigned to the "floater" job, (*id.*; ECF No. 23-2, PageID.239), and being denied a plant transfer (ECF No. 25, PageID.469).

For purposes of retaliation, an adverse employment action is one which "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This standard is "less onerous in the retaliation context than in the anti-discrimination context." *Azuh v. Providence-Providence Park Hosp.*, 380 F. Supp. 3d 665, 676 (E.D. Mich. 2019) (quoting *Laster*, 746 F.3d at 731). And courts consider the "circumstances, expectations, and relationships" of the workplace when making this determination. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 at 69.

Termination is an adverse employment action, so White's firing qualifies. *See Gray v. State Farm Mut. Auto. Ins. Co.*, 159 F.4th 1024, 1033 (6th Cir. 2025). For purposes of the retaliation claim, the Court will also consider the denial of his transfer requests, which White says caused him to continue to work in an environment that harmed his mental health and wellbeing. *See, e.g.*, *Peltier v. United States*, 240 F. Supp. 2d 725, 729 (N.D. Ohio 2003), *aff'd*, 388 F.3d 984 (6th Cir. 2004) ("denial of plaintiff's [transfer request] foreclosed her from receiving a higher salary and caused her to remain in an environment that, a reasonable jury could find, had adversely affected her psychological well-being, and deprived the plaintiff of an opportunity to work under conditions that would not have had that effect"); *see also Laster*, 746 F.3d at 732 ("[f]acing heightened scrutiny, receiving frequent reprimands for breaking

selectively enforced policies, being disciplined more harshly than similarly situated peers" constitute adverse employment actions for Title VII retaliation claim). And because the Court is already considering multiple adverse actions, it will consider White's late notice of a shift end and week-long reassignment to a floater job as well.

Now the Court must analyze whether there is a causal link between White's complaints to HR and these adverse actions. White has made no such showing.

First, as FCA contends, "because White did not return to work, FCA US's system automatically generated and sent White a five-day letter, and he was terminated as a matter of course when he failed to respond, without input from supervisors or consideration of White's employment record." (ECF No. 23, PageID.152.) In other words, this had nothing to do with any complaints he made to HR about treatment from his ex-wife and her friend.

Second, White does not even identify who denied his transfer requests, let alone show that they did so because of his HR complaints.

And third, the essence of White's HR complaints involve the treatment by his ex-wife and her friend, his late notice of shift ends, and his upset at having to work as a floater. So these complaints could not have been the cause of those adverse actions.

This lack of a causal connection alone entitles FCA to summary judgment on White's retaliation claim involving his complaints to HR.

### b. EEOC Charge

White also asserts that he was retaliated against for filing his EEOC charge on June 16, 2023. (ECF No. 23-2, PageID.285; ECF No. 25, PageID.467.) FCA does not contest that the EEOC charge is protected activity, or that it knew about it. (ECF No. 23, PageID.149.) But for the same reasons that pertain to the HR complaints, White cannot show causation—that FCA took the above adverse actions against him *because* he filed the EEOC charge.

Importantly, the EEOC charge was filed in June 2023, one month after he went on medical leave. (ECF No. 23-2, PageID.189 (listing May 17, 2023, as the last day before his leave).) This leave continued through his termination. Thus, any of the behavior that allegedly occurred at the plant, like being told late about early dismissals or assigned to the floater job, predates the EEOC charge and thus, could not have been in response to that charge.

### 2. Pretext

Even if White could make out a prima facie case with either the HR complaints or the EEOC charge, FCA has, for the same reasons set forth above, provided a "legitimate, nondiscriminatory reason for its actions." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

White again has failed to overcome these legitimate, nondiscriminatory reasons by showing they "(1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action." *Harris*

22

*v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

White says that FCA "has not provided any legitimate basis for denial of Plaintiff's and his psychiatrist's request for transfer to a new department." (ECF No. 25, PageID.473.) As already explained, however, this argument does nothing to establish that the lack of transfer had anything to do with his HR complaints or EEOC charge. Indeed, the psychiatrist's requests came at least one year *after* the HR reports. (*Compare* ECF No. 23-2, PageID.245 *with* ECF No. 23-11, PageID.437.) White's argument also ignores FCA's position that he has failed to show the availability of any transfer positions given his seniority level.

Additionally, White provides no viable challenge to FCA's binding independent medical examination process, or that he agreed to it in his union contract. (*See* ECF No. 23-6, PageID.381 (explaining that the IME finding is "binding on the company, the union, and the employee per the provisions of the UAW contract.").) The record before the Court establishes that FCA followed this process with White. So it is unclear how White's firing for failing to comply with this process could be pretext for FCA retaliating against him because he made some HR complaints or filed an EEOC charge. *See Mullins v. Ford Motor Co.*, No. 19-10372, 2021 WL 2823076, at *11 (E.D. Mich. July 7, 2021) ("Simply put, Mullins has not presented sufficient evidence to create a triable issue of fact that the reason offered for his firing was a pretext for retaliation based on his filing of the EEOC Charges.").

Just as crucial, White cannot point to any evidence in the record that the FCA employees who made White's termination or transfer decisions knew about or considered his HR complaints or EEOC charge when making their decisions. *See Mullins*, 2021 WL 2823076, at *11 ("Mullins has failed to cite for the Court any evidence in the record concerning . . . whether any of the relevant decision makers at Ford knew about the EEOC Charges, saw the EEOC Charges, or considered the EEOC Charges when the decision was made to fire him."); *Mulhall v. Ashcroft*, 287 F.3d 543, 551–54 (6th Cir. 2002) (affirming grant of summary judgment on retaliation claim where plaintiff failed to produce any direct or circumstantial evidence that decisionmakers knew about his protected activity).

In fact, the HR official who sent the letter instructing White to return to work or face termination did not know *why* he was absent, only that his absence was not justified. (ECF No. 23-10, PageID.417.)

For all of these reasons, including the lack of evidence that the decisionmaker knew about the EEOC charge or considered it, his retaliation claims fail at summary judgment.

### D. Failure to Accommodate

White also argues that FCA's failure to transfer him to a different plant to accommodate his depression violates the PWDCRA.

To establish a prima facie case under the PWDCRA for failure to accommodate, White must show that:

(1) [he] is disabled within the meaning of the Act;

(2) [he] is otherwise qualified for the position, with or without reasonable accommodation;

(3) [his] employer knew or had reason to know about [his] disability;

(4) [he] requested an accommodation; and

(5) the employer failed to provide the necessary accommodation."

*Picard v. Costco Wholesale Corp.*, No. 20-10005, 2022 WL 4122081, at *5 (E.D. Mich. Sept. 9, 2022) (citing *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011)); *see also Aldini v. Kroger Co. of Michigan*, 628 F. App'x 347, 350 (6th Cir. 2015). If the plaintiff establishes a prima facie case, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Johnson*, 443 F. App'x at 983; *see also Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016).

FCA contends that White cannot even clear the first hurdle because White's depression does not rise to the level of a qualifying disability. White disagrees. (ECF No. 23, PageID.157; ECF No. 25, PageID.476.)

The PWDCRA defines "disability" as a "determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position." Mich. Comp. Laws 37.1103(d)(i)(A).

"[N]ot every impairment rises to the level of a disability under the PWDCRA." *Chiles v Machine Shop, Inc*, 606 N.W.2d 398 (Mich. App. 1999). Like with the ADA,

25

the PWDCRA's federal analogue,[6] the plaintiff must show that his mental disability "substantially limit[s] a major life activity" but that he can still "perfor[m] duties of a particular job." *Tyler v. Kalamazoo Pub. Schs.*, No. 363249, 2024 WL 203791, at *5 (Mich. Ct. App. Jan. 18, 2024), *appeal denied,* 16 N.W.3d 111 (Mich. 2025) (citing *Peden v Detroit*, 680 NW2d 857, 863 (2004)). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, speaking, breathing, learning, and working." *Chiles*, 606 N.W.2d 398 at 407 (quotation marks and citation omitted). "Whether an impairment substantially limits a major life activity is determined in light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term effect." *Mauer v. Gidley*, No. 333230, 2017 WL 4655372, at *5 (Mich. Ct. App. Oct. 17, 2017) (citing *Lown v. JJ Eaton Place*, 598 N.W.2d 633, 637 (Mich. App. 1999)).

Courts in the past have declined to find depression a disability. *See Allen v. BellSouth Telecommunications, Inc.*, 483 F. App'x 197, 201 (6th Cir. 2012) (considering depression to be too short to qualify as a disability under pre-amended version of ADA); *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 371 (6th Cir. 2013) (same). But that was before Congress amended the ADA in 2008 to broaden its disability definition. ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). Since then, courts have construed the definition of disability more

---

[6] *See Chiles*, 606 N.W.2d at 405 ("[T]he federal Americans with Disabilities Act (ADA) . . . and the PWDCRA share the same purpose and use similar definitions and analyses, and [Michigan state courts] have relied on the ADA in interpreting the PWDCRA.").

broadly, explaining "the primary concern of the ADA is 'whether covered entities have complied with their obligations and whether discrimination has occurred,' not whether an individual's impairment is a disability." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (citing 29 C.F.R. § 1630.2(j)(1)(iii)).

While the PWDCRA is not the ADA, Michigan courts have found that depression can qualify as a disability under the PWDCRA. *Payment v. Dep't of Transportation*, No. 332827, 2017 WL 3441453, at *1 (Mich. Ct. App. Aug. 10, 2017) ("There is no serious dispute, nor would we entertain any, that depression and anxiety *can* cause one to be 'disabled' for the purpose of the PWDCRA.").

Here, construing the evidence in his favor, White has shown he has a qualifying disability. He testified that his depression interfered with his ability to work and communicate with others. (ECF No. 23-2, PageID.194, 268 (explaining that he isolated himself and did not do anything but "get up, shower, and go back to bed.").)

The parties do not dispute the second and third elements. White was qualified for his position with or without a reasonable accommodation. And FCA knew or had reason to know of the disability because his doctor sent multiple letters to the company about his depression. (ECF No. 23-2, PageID.206, 281.)

Moving on to the fourth element, while White does not recall submitting a written request for an accommodation because of a disability or specifically using the word accommodation, he testified that he "begged to be moved to a different department," that he requested a transfer multiple times, and that his doctor sent notes in support based on White's depression. (*Id.* at PageID.205–206, 281.) Indeed,

27

one of the doctor notes stated that White required a "reasonable accommodation that could take [his] disability into consideration and allow [him] to return to work." (*Id.* at PageID.281.) So "the context in which the letter was written permits an inference that [FCA] knew or should have known that [White] sought [an accommodation]" of transferring to a new plant due to his mental health issues. *See Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004); *see also Everson v. SCI Tennessee Funeral Servs., LLC*, No. 15-01478, 2018 WL 1899368, at *7 (M.D. Tenn. Apr. 20, 2018) ("Although Plaintiff did not specifically request a 'reasonable accommodation,' a jury could construe Plaintiff's request to [employer] for time off work as a request for a reasonable accommodation."); *Feltner v. Mike's Trucking*, No. 12-926, 2014 WL 272446, at *9 (S.D. Ohio Jan. 23, 2014) ("Plaintiff can show that he requested an accommodation in April of 2010 when he provided a note from his doctor excusing him from lifting over 50 pounds.").

The fifth and final element is whether FCA denied White a reasonable accommodation by not granting his transfer requests. This turns on the basis for the requests. The record shows that White sought the transfer to avoid working with Massey and Nelson because the way they treated him and the environment they created caused him depression. But the Sixth Circuit has held that "[a] transfer request is not reasonable if it was made to avoid working with certain people." *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 571 (6th Cir. 2023) (citing *Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 858 (6th Cir. 2002)). This is because

28

"[a] court is not in a position to 'act as a super-bureau of Human Resources' and determine who should work with whom." *Id.*

*Hrdlicka* is directly on point. There, an employee was transferred to a new team where she soon butted heads with her new bosses and coworkers. *Id.* at 561. She developed depression and her job performance declined. *Id.* at 564. So she requested a transfer back to her old team based on her "distaste for her current work environment." *Id.* at 560. "She explicitly noted that her depression began once she was transferred to the Design Academy, and that this 'precipitated her request for a transfer back to Sculpting.'" *Id.* at 571. "These facts," said the Sixth Circuit, "compel the conclusion that her transfer request was specifically linked to her distaste for her current work environment. Basically, it was a desire to "force [the defendant] to transfer [her] so that [she] will not be required to work with certain people." *Id.* The Court found this was not a reasonable accommodation request. *Id.* (citing *Deister*, 647 F. App'x at 658 n.2 ("[A]n employer is not obliged to honor, as a 'reasonable accommodation,' an employee's request for assignment to a different supervisor.") and *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) (finding that a request for a different supervisor is not a reasonable accommodation because that would ask the court to allow her to "establish the conditions of her employment")). So too here. White sought a transfer based on distaste for his current work environment and to avoid working with Massey and Nelson. Thus, this is not a reasonable accommodation request.

29

Additionally, for his transfer request to be "reasonable," White needed to show that "an open position existed and that [he] qualified for it to overcome an employer's summary-judgment motion." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 420 (6th Cir. 2020) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)). "Employers are required to consider transferring an employee with a disability to a position only if it is vacant." *Equal Emp. Opportunity Comm'n v. Clarksville Health Sys., G.P.*, 617 F. Supp. 3d 844, 865 (M.D. Tenn. 2022). An employer does not have to "fire other employees to manufacture such openings, or create new positions." *Smith v. Newport Utilities*, 129 F.4th 944, 952–53 (6th Cir. 2025). White has not identified any such positions. He simply testified that he put requests in the portal and did not hear back. (ECF No. 23-2, PageID.205–206 (acknowledging that transfers are granted based on seniority and availability, and confirming there is no evidence his request was blocked).) This too supports FCA's request for summary judgment. *See, e.g.*, *Kleiber*, 485 F.3d at 870 ("Absent any evidence that Honda continued to hire Production Associates, seek out applicants, or accept applications during the relevant time period, we cannot conclude that a reasonable jury could find that a vacancy existed."); *Fisher*, 951 F.3d at 420 ("Fisher has not shown any 'special circumstances' (such as the employer's failure to abide by its seniority system) that could overcome that general proposition." (internal citations omitted)).

In sum, no reasonable jury could find in White's favor on his failure to accommodate claim.

### E. Hostile Work Environment

Next, FCA seeks summary judgment on White's claim that he was subjected to a hostile work environment in violation of the PWDCRA. (ECF No. 23, PageID.158.) White says he "endured ongoing comments, ridicule, and exclusion" done with "knowledge of his depression" and creating an intolerable environment. (ECF No. 25, PageID.477.)

To establish a prima facie case of hostile work environment under the PWDCRA, White must show:

> (1) [he] belonged to a protected group;
>
> (2) [he] was subjected to communication or conduct on the basis of the protected status;
>
> (3) the conduct was unwelcome;
>
> (4) the unwelcome . . . conduct or communication was intended to or in fact did substantially interfere with [his] employment or created an intimidating, hostile, or offensive work environment; and
>
> (5) respondeat superior.

*Mazur v. Wal-Mart Stores, Inc.*, 250 F. App'x 120, 127–28 (6th Cir. 2007) (internal citations omitted).

The Court has already determined, despite FCA's contention to the contrary, that White's depression is a qualifying disability.

Thus, to go forward with a PWDCRA claim based on hostile work environment, White must show he was subjected to harassing conduct based on his depression. "An employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class, rather than personal dislike." *Trepka*

31

*v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002). "Even if these incidents of other employees laughing at or teasing [plaintiff] occurred regularly, they would not satisfy the standard for a hostile work environment because they evidence mere personal dislike and constitute mere teasing that does not establish an actionable hostile work environment." *Mazur*, 250 F. App'x at 129.

White has a litany of complaints about how Massey and Nelson treated him. (ECF No. 23-2, PageID.221–235.) They told him his shift ended late, threatened to take him off the job, made vague threats, and commented on his divorce. (*Id.*) Even worse, they invited other co-workers to a "divorce party" to celebrate Massey's separation from White. (*Id.* at PageID.260.) This resulted in other unwelcome comments. (*Id.* ("there's actually—a guy, actually, was murdered in the plant because of the husband and wife situation. And it would be repeated to me several times, 'This place is known to kill those, to kill husbands.' It was just a barrage of people approaching me about statements she made.").) But White's testimony made clear that his personal issues with Massey and Nelson and the toxic work environment they created is what *caused* his depression. He was not treated this way *because of* his depression. (*Id.* ("Q: So related to your marriage and divorce? A: Yes"); *id.* at PageID.226 ("Q: Okay. So you said you were receiving ongoing harassment from Yolanda [Massey], personal arguments; were these related to your divorce? A: Yes.").) Said another way, White was mistreated by co-workers because he was Massey's ex-husband; not because he had depression. Courts can only entertain a PWDCRA hostile workplace claim based on disability, not dislike.

What is more, White points to nothing in the record to show that Massey and Nelson knew about his disability. His depression was diagnosed in January 2023. (ECF No. 23-2, PageID.193.) But most of his complaints about unwelcome comments and treatment predate that time. (*See e.g.,* ECF No. 23-2, PageID.245, 256 (detailing HR complaints from February and April 2022).). When asked if he had "any basis for the belief that [Massey] and [Nelson's] treatment of [him] was based on [his] depression," White testified, "I believe they knew I didn't have any more fight in me so they kept attacking." (ECF No. 23-2, PageID.308.) This does not create a genuine issue of material fact that they targeted him due to his depression.

Thus, no jury could find in his favor for his PWDCRA hostile work environment claim.

### F. Wrongful Discharge

White has one remaining wrongful discharge theory: that his termination violated Michigan public policy. (ECF No. 1, PageID.24.)

Although employment is generally at will, Michigan recognizes an exception based on "the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski v. Michigan Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982). The Michigan Supreme Court has described three examples of when this principle applies: "(1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the

employee is discharged for exercising a right conferred by a well-established legislative enactment." *McNeil v. Charlevoix County*, 772 N.W.2d 18, 24 (Mich. 2009) (citing *Suchodolski*, 316 N.W.2d at 711).

FCA correctly argues that there is no public policy protecting employees "who "complain that a former significant other is retaliating against them in the workplace" as alleged by White. (ECF No. 23, PageID.161 (citing ECF No. 1, PageID.25).) Indeed, the Sixth Circuit has held based on Michigan case law that a public policy claim cannot be based on internally reporting alleged unlawful conduct to a supervisor. *See Scott v. Total Renal Care, Inc.*, 194 F. App'x 292, 298 (6th Cir. 2006) ("The district court properly dismissed Scott's claim for retaliatory discharge in violation of Michigan public policy because no law or policy tells Michigan employers that they must not retaliate against employees who report legal violations to their supervisors."); *Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 328 (6th Cir. 2003) ("[W]e are not persuaded that Michigan has provided a 'public policy' cause of action for an employee who is discharged for reporting violations of law to a superior."); *see also Robinson v. Radian, Inc.*, 624 F. Supp. 2d 617, 640 (E.D. Mich. 2008) ("The Court concludes that *Scott* and *Cushman-Lagerstrom* control on this issue and that under these authorities, a public policy claim cannot be based on internally reporting alleged unlawful conduct to a supervisor.").

White offers no real response. He merely states that FCA violated the PWDCRA, ELCRA, § 1981, and Title VII. (ECF No. 25, PageID.479). Even assuming

34

this equates to a violation of public policy, the Court has already found that those statutory claims fail as a matter of law.

Thus, White's claim of wrongful discharge in violation of Michigan public policy also fails to survive summary judgment.

### III. Conclusion

For the foregoing reasons, the Court GRANTS FCA's motion for summary judgment (ECF No. 23).

IT IS SO ORDERED.

Dated: March 16, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE